# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LARRY SADLER, AS TRUSTEE OF THE )
LARRY R. SADLER IRREVOCABLE TRUST, )
individually and on behalf of all ) No. 12 C 5882
others similarly situated, )
)
) Judge Thomas M. Durkin
Plaintiff, )
)
v. )
)
RETAIL PROPERTIES OF AMERICA, INC., *et al.*, )
)
Defendants. )
-------------------------------------------------------- )
CHARLES BABIN, *et al.*, on behalf of )
themselves and all others similarly situated, )
) No. 12 C 6433
Plaintiff, )
)
v. )
)
RETAIL PROPERTIES OF AMERICA, INC., *et al.*, )
)
Defendants. )
-------------------------------------------------------- )
RON R. SCHNIERSON, individually and on )
behalf of all others similarly situated, )
) No. 12 C 6743
Plaintiff, )
)
v. )
)
RETAIL PROPERTIES OF AMERICA, INC., *et al.*, )
)
Defendants. )
-------------------------------------------------------- )

LOIS A. OLIVE LIVING TRUST DTD 6/25/02, )
*et al.*, individually and on behalf of all )
others similarly situated, )          No. 12 C 8091
)
            Plaintiff, )
)
        v. )
)
RETAIL PROPERTIES OF AMERICA, INC., *et al.*, )
)
            Defendants. )
------------------------------------------------------------ )
FRANK JEFFERS, on his own behalf of and )
on behalf of all those similarly situated, )
)          No. 12 C 8522
            Plaintiff, )
)
        v. )
)
RETAIL PROPERTIES OF AMERICA, INC., *et al.*, )
)
            Defendants. )

## MEMORANDUM OPINION AND ORDER[1]

This is a securities fraud action consisting of five related, individually-filed

putative class actions (*Sadler*, 12 C 5882; *Babin*, 12 C 6433; *Schnierson*, 12 C 6743;

*Olive*, 12 C 8091; *Jeffers*, 12 C 8522) against Retail Properties of America, Inc.

---

[1] All citations include the particular case docket that contains the document, the
document's record number, and the corresponding page or paragraph—e.g., the
*Sadler* complaint will be cited as "*Sadler¸* R. 1 ¶ __."

("RPAI"), formerly known as Inland Western Real Estate Trust ("Inland Western");[2] and certain officers and directors of RPAI: Angela M. Aman, Kenneth H. Beard, Frank A. Catalano, Jr., Shane C. Garrison, Paul R. Gauvreau, Gerald M. Gorski, Steven P. Grimes, Brenda G. Gujral, Richard P. Imperiale, James W. Kleifges, Kenneth E. Masick, and Barbara A. Murphy (collectively, the "Individual Defendants").[3] The *Jeffers* case also includes counts against Ameriprise Financial Services, Inc. ("Ameriprise"). Each of the cases arises out of the Individual Defendants' management and administration of RPAI, in addition to Ameriprise's role in procuring the sale of RPAI shares to its customers. The Defendants have each filed motions to dismiss. *See Sadler*, R. 80; *Babin*, R. 33; *Schnierson*, R. 35; *Olive*, R. 27; *Jeffers*, R. 47; R. 48. For the following reasons, the motions are granted, and the cases are dismissed.

---

[2] The Court will refer to the company as "Inland Western" for all factual allegations prior to its name change to RPAI on March 8, 2012. The Court will refer to the company as "RPAI" for all factual allegations after that date and all references to the company as a defendant in this case.

[3] The individual defendants listed in each complaint vary. The differences do not affect the Court's analysis, so the Court will collectively refer to the group when referring to each complaint regardless of whether an individual is named in the particular complaint.

## I.  The Parties

RPAI, formerly known as Inland Western, is a Maryland corporation that operates as a real estate investment trust ("REIT"). *Sadler*, R.1 ¶¶ 1-2, 12-13. It is one of the largest owners and operators of shopping centers in the United States, which includes stores such as Target, Best Buy, HomeDepot, and Kohl's. *Id.* ¶¶ 2, 12, 28. At all relevant times, RPAI's Board consisted of either eight or nine directors: Beard, Catalano, Gauvreau, Gorski, Grimes, Gujral,[5] Imperiale, Masick, and Murphy. *Babin* R.1 ¶¶ 12-20. Seven members of the Board were independent directors: Beard, Catalano, Gauvreau, Gorski, Imperiale, Masick, and Murphy. *Olive*, R. 1 ¶¶ 20-26.

As an REIT, RPAI combines the capital of many investors to own and operate income-producing real estate locations. *Sadler*, R.1 ¶ 13. Prior to the public offering on April 5, 2012, when RPAI became listed on the New York Stock Exchange (the "2012 Offering," discussed below), "Inland Western was a public unlisted REIT,

---

[4] The Court may consider RPAI's prospectuses and other relevant SEC and publicly-filed documents in its ruling on the motion to dismiss, even if they are not referred to in the complaints. *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09 C 5641, 2011 WL 1303387, at *8 (N.D. Ill. Mar. 31, 2011); *Seidel v. Byron*, 405 B.R. 277, 284-85 (N.D. Ill. 2009); *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2002 WL 1160171, at *2 (N.D. Ill. May 30, 2002); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012) (stating that a court may "consider public documents and reports of administrative bodies that are proper subjects for judicial notice, though caution is necessary, of course").

[5] Babin alleges that Gujral resigned as a director, effective May 31, 2012. *Babin*, R. 4 ¶ 18.

meaning that, (1) it was public because it was registered with the SEC, could sell to the investing public rather than only to 'qualified investors,' and was required to file reports with the SEC; and (2) it was unlisted because its securities were not listed on a national stock exchange." *Id.* ¶ 14. These types of shares are referred to as "non-traded REITs." *Jeffers*, R. 21 ¶ 10. Generally, an investor in non-traded REITs will look to hold the shares for a certain term (according to the complaints, for five to seven years), with the expectation that that the shares will eventually be listed on a national securities exchange. *Id.* If the investor seeks to sell the non-traded REITs before the term of investment expires, the person must resell his shares to the REIT's sponsor or through the secondary market which lacks a definite price point. *Id.* ¶ 11.

Ameriprise is a nationwide financial planner, advisor, and broker dealer of securities operating under the regulations of the Financial Industry Regulatory Authority ("FINRA"). *Id.* ¶ 45. It employs financial planners across the country who charge fees for investing the money of its clients. *Id.* ¶¶ 18-19. Jeffers alleges that Inland Western, and later RPAI, paid certain compensation to Ameriprise in return for Ameriprise "pushing" investors to invest in the Inland Western REIT in 2004 and 2005, as discussed below. *Id.* ¶¶ 14, 26. The *Jeffers* Plaintiffs further allege that Ameriprise's clients have purchased approximately $1.1 billion of Inland Western stock. *Id.* ¶ 71.

The Plaintiffs are shareholders of RPAI who purchased their shares sometime between 2004 and 2012. Some allege that they purchased shares in either

2004, 2005, or both years.[6] *See Sadler*, R. 1 ¶ 11; *Schnierson*, R. 1 ¶ 11; *Olive*, R. 1 ¶ 12; *Jeffers*, R. 21 ¶ 37. Others contend that they purchased shares through RPAI's Distribution Reinvestment Program ("DRP") sometime before April 5, 2012. *See Sadler*, R. 1 ¶ 11; *Babin*, R. 4 ¶ 59. This means they received additional shares of the company's stock instead of receiving a distribution. The *Jeffers* Plaintiffs were "advised or counseled by Ameriprise" to purchase shares of the REIT. *Jeffers*, R. 21 ¶ 57.

## II. The Factual Allegations

RPAI, through two public offerings (one in 2004, the other in 2005) and a merger in 2007, issued 459,484,000 shares of "common stock" at $10.00 per share. *Sadler*, R.1 ¶ 29. This resulted in gross proceeds, including consideration from the merger, of $4,595,193,000. *Id.* As of December 31, 2011, RPAI had also issued shares through its DRP, which included 77,126,000 shares at prices from $6.85 to $10.00 per share resulting in gross proceeds of $719,799,000. *Id.* Additionally, from 2004 to the end of 2011, RPAI repurchased a total of 43,823,000 shares through its Share Repurchase Program ("SRP") at prices ranging from $9.25 to $10.00 per share, for a total cost of $432,487,000. *Id.* According to the Plaintiffs, as of December 31, 2011, RPAI had total shares outstanding of 483,822,000 and had realized total net offering proceeds of $4,882,572,000. *Id.* The Plaintiffs as a whole

---

[6] Each of the cases includes a motion for class certification. For convenience, the Court will refer to all of the named plaintiffs and the proposed classes as the "Plaintiffs." When it is necessary to distinguish between cases and classes, the Court will refer to those plaintiffs with the case name first—e.g., the *Sadler* Plaintiffs.

allege that they purchased Inland Western stock outright sometime in 2004 or 2005, or through the DRP.

Inland Western began having cash problems in 2008 and early 2009, eventually defaulting on six mortgage loans totaling $54,900,000 in May 2009. *Id.* ¶ 32. As a result, the Board voted to suspend the SRP, effective November 19, 2008. *Id.* ¶¶ 29, 31. In March 2009, Inland Western slashed its dividends by 90%. *Id.* ¶ 31. At that point, the only way for shareholders to sell their shares was in an allegedly "extremely thinly traded secondary market" or to accept the "occasional tender offer" from other companies. *Id.* ¶ 33.

On November 29, 2009, Inland Western transferred a portfolio of entities that owned 55 investment properties into "IW JV, a wholly-owned subsidiary of Inland Western." *Id.* ¶ 36. Inland Western then sought additional capital of $50 million from Inland Equity, a related party, in connection with a $625 million debt refinancing transaction involving J.P. Morgan Chase Bank. *Id.* ¶ 37. Inland Equity received a 23% non-controlling interest in IW JV from the deal. *Id.*

On December 21, 2009, CMG Acquisition Co., LLC ("CMG"),[7] an unaffiliated third party, submitted a mini-tender offer[8] to Inland Western's stockholders, offering $1.50 per share. *Jeffers*, R. 21 ¶ 65. Inland Western recommended that its

---

[7] Any affiliate company of CMG Acquisition—e.g., CMG Partners—will also be referred to as "CMG."

[8] A mini-tender offer is an offer to purchase less than 5% of a company's issued stock directly from current investors.

stockholders reject the offer because it was "substantially below [its] December 31, 2009 estimated value of $6.85 per share." *Id.* ¶¶ 66-67. Inland Western confirmed its $6.85 "estimated value" for the shares in its Form 8-K filing with the SEC approximately one month later on January 15, 2010, though it noted that the "estimated value may not reflect the actual market value of [the] shares on any given date." *Id.* ¶ 67; *Sadler*, R. 1 ¶ 33.

Inland Western issued an SEC Form DEF 14A proxy statement[9] on December 8, 2010, informing shareholders of a special meeting being held on February 24, 2011, and asking them to "approve an amendment and restatement of the Company's charter in conjunction with the initial listing of the Company's common stock." *Sadler*, R. 1 ¶ 41. In an effort to create liquidity for the stock, Inland Western stated that it intended to pursue an "initial listing of [its] existing stock within the next 12 months" and that "an exchange listing [would] better prepare the Company for future growth." *Id.* ¶ 42. The Plaintiffs allege that Inland Western was struggling with its outstanding debt and facing pressure from its creditors and, thus, "looked to the listing as a means to avoid default and multiple foreclosures." *Id.* ¶ 43.

The proxy statement also described what it called the "phased-in liquidity program" and a "Class B stock dividend grant" in which each share existing prior to

---

[9] An SEC Form DEF 14A is a form under Section 14(a) of the Securities Exchange Act of 1934 that that must be filed with the SEC when a shareholder vote on a particular issue is required.

the 2012 Offering would be split into four shares. *Id.* ¶ 44. The Proxy Statement

included the following information:

**Q. How many shares of stock will I own after the implementation of the phased-in liquidity program?**

A. The number of shares that you will own will depend on the type of phased-in liquidity program that we implement. As an example, assume that you currently own 100 shares of our common stock. The following diagrams illustrate what would occur if we implemented the phased-in liquidity program that we currently anticipate.

*Phased-In Liquidity Program:*



*Shares Owned After Phased-In Liquidity Program:*



*Id.* ¶ 44. Shareholders were further informed that the program would have "no effect" on their proportional interest in Inland Western because it would affect all holders in the same manner. *Id.* ¶¶ 44-45.

Inland Western filed another SEC Form DEF 14A proxy supplement with the SEC in January 4, 2011, which discussed the potential of a reverse stock split. *Id.* ¶ 46. This stock split was a part of Inland Western's recapitalization plan (the "Recapitalization"). *Jeffers*, R. 21 ¶ 70. The reverse stock split would be at a 10-to-1 ratio and affect all shareholders equally. *Id.* Its intended purpose was to reduce Inland Western's outstanding shares as of December 1, 2010, from 486,345,479 to 48,634,547.9. *Sadler*, R. 1 ¶ 46. Additionally, the supplement stated that the split would have "no effect" on the aggregate value of the shareholder's shares of common stock. *Id*. The supplement included the following illustrative example of the split:

Q. How many shares of stock would I own after the implementation of a reverse stock split and the phased-in liquidity program?

A. The number of shares that you would own will depend on the size of the reverse stock split and the type of phased-in liquidity program that we implement. As an example, assume that you currently own 1,000 shares of our common stock and assume that these shares are worth $6.85 per share. The following diagrams illustrate what would occur if we implemented a 10 to one reverse stock split and the phased-in liquidity program that we currently anticipate.

*Step 1: Reverse Stock Split:*



*Step 2: Phased-In Liquidity Program:*



*Shares Owned After Reverse Stock Split and Phased-In Liquidity Program*:



*Id.* ¶ 47. According to the Plaintiffs, based on that information, Ameriprise "applied a valuation of $17.375 to [Inland Western's] shares in its communications with clients based on the representations of Inland REIT and the Inland REIT Board." *Jeffers*, R. 21 ¶ 71.

Inland Western filed another Form 8-K with the SEC on February 7, 2011, amending its credit agreements with KeyBank National Association and JPMorgan

Chase Bank, N.A., "to provide a senior secured credit facility in the aggregate amount of $585 million." *Sadler*, R. 1 ¶ 49. In a Form S-11 Registration Statement (the "Registration Statement") filed a week later on February 14, Inland Western explained that "more than 5% of the net proceeds of [the] offering [were] intended to be used to repay amounts owed" to the underwriters, *id.* ¶ 50, $210 million of the net proceeds of the offering were to pay down its "senior secured revolving line of credit," and the remaining net proceeds would be for "general corporate and working capital purposes." *Id.* ¶ 51. Stockholders approved the amendment and restatement of Inland Western's charter at the meeting on February 24. According to the *Jeffers* complaint, "94.8% of Inland Western's stockholders voted in favor of the Recapitalization and pursuing a public listing of [Inland Western's] shares." *Jeffers*, R. 21 ¶ 71.

On March 1, 2011 the SEC sent a letter to Inland Western requesting more detail regarding the Registration Statement. *Sadler*, R. 1 ¶¶ 54-55. In response, Inland Western filed a Form S-11/A on April 29, 2011, in which it again described the Recapitalization and provided additional details regarding its plan to satisfy its debt. *Id.* ¶¶ 54-57.

On May 27, 2011, CMG made a second mini-tender offer of $3.00 per share to Inland Western's shareholders; Inland Western again recommended that its shareholders reject the offer. *Id.* ¶ 58. Inland Western increased the estimated value of its shares from $6.85 to $6.95 (before taking into account the reverse stock split) in another Form 8K filed with the SEC on June 20, 2011, though it noted that

"[n]o independent appraisals [of the shares] were obtained." *Id.* ¶ 59. CMG made a

third mini-tender offer on October 27, 2011, for $3.50 per share. *Id.* ¶ 60.[10] Inland

Western recommended for a third time that its shareholders reject the offer,

"pointing out that in the thinly-traded secondary market, trades had been reported

in the range of $4.08 and $6.00 per share." *Id.* The letter stated in part:

> We are aware that you may have received an unsolicited mini-tender offer by
> CMG Partners ("CMG") dated October 27, 2011 to purchase up to 1,000,000
> shares of Inland Western Retail Real Estate Trust, Inc. ("Inland Western") for a
> price of $3.50 per share, less the amount of any distributions paid to you on or
> after December 12, 2011. CMG and its offer are **not affiliated** with Inland
> Western.
>
> The Inland Western Board of Directors has unanimously determined that the offer
> is not in the best interests of the stockholders, as the Board of Directors believes
> that the value of Inland Western shares exceeds the offer price. Although each
> stockholder has his or her individual liquidity needs and must evaluate the offer
> accordingly, the Board of Directors **does not recommend or endorse** CMG's
> mini-tender offer and suggests that stockholders reject the offer and not tender
> their shares pursuant to the offer. If you wish to reject the offer and retain your
> shares, **no action is necessary.**

*Schnierson*, R. 1 ¶ 39 (emphasis in original).

Inland Western sent another letter to its shareholders on February 28, 2012,

explaining that shares could be purchased through the DRP on or after March 31,

2012, for $5.75 per share. *Sadler*, R. 1 ¶ 63. On March 6, 2012, Inland Western filed

a "presentation" in a Form FWP,[11] entitled "Anticipated NYSE Listing &

---

[10] The mini-tender offers from December 21, 2009; May 27, 2011; and October 27,
2011, will be referred to collectively as the "mini-tender offers."

[11] An FWP is a filing under Securities Act Rules 163/433 of Free Writing
Prospectuses.

Concurrent Equity Offering," which explained the 2012 Offering and the results of

the reverse stock split:

> In preparation for a potential listing, the Company will effectuate a reverse stock split and a stock dividend to existing shareholders.
>
> Rationale:
>
> - The rationale for the reverse stock split is to reduce the amount of shares outstanding and reset the price per share. On a stand-alone basis, the reverse stock split will have <u>no</u> <u>impact</u> on the aggregate value of the Company or any individual shareholder's percentage ownership of the Company's common stock.
>
> - The rationale for the stock dividend is to provide for the Company's phased-in liquidity program, which has been designed to assist in the creation of an orderly and liquid trading market for our shares post-listing.
>
>   o All of our shares of common stock will be converted into listed shares within 18 months of the initial listing.
>
> Reverse stock split
>
> A reverse stock split is a combination of all of our outstanding shares of common stock into a fewer number of shares.
>
> This will affect all shareholders in the same manner - on a stand-alone basis, the reverse stock split will have no effect on the aggregate value of the Company, your proportional ownership interest in the Company, your voting rights, your right to receive dividends (if and when declared), the total amount of your dividends (if and when declared), or your rights upon liquidation.
>
> Example:
>
> 
>
> 10 to one reverse stock split
> = 100,000/10
>
> 

| 100,000 shares Common Stock<br>482MM shares outstanding<br>= .0207% ownership |  | 10,000 shares Common Stock<br>48.2MM shares outstanding<br>= .0207% ownership |
| --- | --- | --- |

*Id.* ¶ 64 (underlining in original). The filing also described the expectation to

become a company with "liquidity for its shareholders," "greater potential for access

to multiple sources of capital," and "an expanded ability to prudently grow the Company and potentially create additional shareholder value over time." *Id.*

Inland Western changed its name to RPAI two days later on March 8, 2012. *Id.* ¶ 65. On March 20, 2012, RPAI followed through with the 10-to-1 reverse split, paying "a stock dividend of Class B-1 through B-3 common stock" on March 21. *Id.* ¶¶ 66-67. All of this was announced in RPAI's amended Registration Statement filed on March 23, 2012. *Id.* ¶ 68. The statement also revealed that the price per share for the 31,800,000 shares of Class A Common Stock offered in the 2012 Offering would be between $10.00 and $12.00, which was below the $17.125 estimated value that was presented to the shareholders before the February 24, 2011 vote. *Id.* ¶ 69. The shareholders were subsequently informed that 100% of the net proceeds from the 2012 Offering would be used to pay down RPAI's debt and repurchase its full interest in IW JV. *Id.* ¶ 70. On March 29, 2012, RPAI recommended that its shareholders reject another tender offer made by CMG on March 16, 2012, this time for $3.00 per share, a reduction of $0.50 per share from its last mini tender offer on October 27, 2011. *Id.* ¶ 71. The Plaintiffs allege that on March 21, 2012, contrary to the information in the amended Registration Statement from March 23, 2012, RPAI and the Individual Defendants represented to Ameriprise that "'there was no material change in the REIT's financial condition and essentially agreed it was reasonable for Ameriprise to use the $17.375 value" of the shares when presenting the 2012 Offering to its clients. *Jeffers*, R. 21 ¶ 71 (internal quotation marks omitted).

15

RPAI filed a prospectus with the SEC on April 5, 2012, which included an offering price of $8.00 per share, $2.00 to $4.00 less than what it had listed in its March 23 amended Registration Statement and approximately $9.00 less than the $17.125 price discussed in its January 4, 2011 proxy supplement. *Sadler*, R. 1 ¶ 72; *Jeffers*, R. 21 ¶ 73. The Plaintiffs allege that as a result of the $8.00 value in the 2012 Offering, "[t]he combined investments totaling $4,595,193,000 collected by Inland Western through two public offerings . . . and a merger consummated in 2007, were . . . worth only $1,470,461,760—a loss of over $3 billion." *Sadler*, R. 1 ¶ 74. RPAI explained the $8.00 per share public offering price in a Form 8-K filed on April 12, 2012, as follows:

**9. How was the public offering price of $8.00 per share determined?**

The offering was marketed to the investing public. RPAI launched its public offering on March 23, 2012 and met with potential investors across the country to solicit interest for the public offering leading up to the pricing of the public offering on April 4, 2012. In connection with the pricing of the public offering, the underwriters engaged in a book building process, pursuant to which they solicited indications of interest from potential investors. Interested investors provided the underwriters with an indication of the number(s) of shares and price(s) at which they would be interested in participating in the offering. The pricing of the public offering was agreed upon by RPAI and the underwriters based on the indications of interest that were received from potential investors. The ultimate offering price represented a price at which RPAI believed it could successfully complete the offering in a manner that achieved its goals in pursuing the concurrent public offering and listing of its Class A Common Stock.

**10. Why did the public offering price differ from the estimated per-share value as of March 31, 2011?**

The processes by which the public offering price and the estimated per-share value were determined were significantly different, as noted above. Differences would be expected as a result of the fact that the public offering represented the market's current valuation of the acquisition of a non-controlling interest in a newly listed public company by dispersed investors. Furthermore, as noted at the time the estimated per-share value was first

published, this number was "only an estimate and may not reflect the actual value of our shares of common stock or the price that a third party may be willing to pay to acquire our shares." Lastly, the public offering price also reflected the impact of the recent reverse split and stock dividend. The estimated per-share value as of March 31, 2011 had not reflected these transactions.

*Id.* ¶ 75.

The Plaintiffs allege that as a result of the 2012 Offering, "investors, some of whom had originally bought into the REIT at prices as high as $10 per share saw a decline in value of more than 70% when taking into account that the actual split adjusted value of the stock is less than $3 per share." *Jeffers*, R. 21 ¶ 75. In other words, the Plaintiffs allege that RPAI, "which had been selling pre-split shares to its own shareholders for $6.95 a share as late as February 2012[,] was forced to acknowledge that on the open market its shares could fetch less than half [of] what [it] had been charging for them—a mere $3.20 a share." *Babin*, R. 4 ¶ 53.

On May 8, 2012, RPAI informed its shareholders in a letter that there was a pending SEC investigation.[12] *Schnierson*, R. 1 ¶ 46. The letter said:

The Company has learned that the SEC is conducting a non-public, formal, fact-finding investigation to determine whether there have been violations of certain provisions of the federal securities laws regarding the business manager fees, property management fees, transactions with affiliates, timing and amount of distributions paid to investors, determination of property impairments, and any decision regarding whether the Company might become a self-administered REIT. The Company has not been accused of any wrongdoing by the SEC.

*Id.*

---

[12] The Court has not been informed of any updates or further developments regarding the SEC investigation.

### III.    Procedural Posture

The Plaintiffs filed lawsuits complaining of the losses they allege to have sustained as a result of the events previously described. The *Sadler* case was the first case filed, which occurred on July 26, 2012. The *Babin* case was filed on October 14, 2012, the *Schnierson* case on October 22, the *Olive* case on October 10, and the *Jeffers* case on October 23. Judge Joan B. Gottschall determined that the four subsequently-filed cases were related to the *Sadler* case, and thus, they were all reassigned to her. *Sadler*, R. 78 at 3. The cases were later transferred to the undersigned Judge. *Id.*, R. 72. Counsel for RPAI and the Individual Defendants filed a motion to dismiss on April 19, 2013, addressing each of the five cases. *E.g.*, *id.*, R. 80. Counsel for Ameriprise, which is only a defendant in the *Jeffers* case, also filed a motion to dismiss. *Jeffers*, R. 47.

### LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will

not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

Additionally, claims sounding in fraud are subject to a more stringent pleading requirement. Federal Rule of Civil Procedure 9(b) requires plaintiffs alleging fraud to state "with particularity" the circumstances constituting fraud. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (noting that plaintiffs in securities fraud cases must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud'" (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976))). "In other words, Plaintiffs need[] to plead 'the identity of the person who made the misrepresentation, the time, place[,] and content of the misrepresentation, and the method by which the misrepresentation was communicated to the [Plaintiffs].'" *Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 870 (7th Cir. 2013) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008)) (second and third alternations in *Gandhi*). This encompasses the "'who, what, when, where, and how'

of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011)).

## ANALYSIS[13]

The five complaints contain a number allegations concerning why the Plaintiffs are entitled to relief. These claims include breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, unjust enrichment, a violation of the Illinois Securities Law of 1953 ("ISL"), violation of certain FINRA regulations, and a request for the imposition of a constructive trust. The Court will address each group of claims in turn. In doing so, the Court will apply Maryland law to the breach of fiduciary duty, aiding and abetting, unjust enrichment, and constructive trust claims against RPAI and the Individual Defendants because RPAI is incorporated and operates in Maryland, and that is essentially where the claims against it allegedly occurred. The Court will apply Illinois law to the claims against Ameriprise for similar reasons. The parties do not dispute these choice of law decisions.

---

[13] RPAI and the Individual Defendants divide the cases into three categories: *Sadler*—the "Listing Complaint"-; *Babin*—the "DRP Complaint"; and *Olive*, *Schnierson*, and *Jeffers*—the "Mini-Tender Complaints." When appropriate, the Court will apply overlapping reasoning from one group to the other.

## I. Breach of Fiduciary Duty

### A. Individual Defendants: *Sadler* – Count I; *Babin* – Count I; *Schnierson* – Count I; *Olive* – Count I; *Jeffers* – Count I

Each of the five cases includes a count for breach of fiduciary duty against the Individual Defendants. The complaints include allegations that the Individual Defendants "caus[ed] or allow[ed] [RPAI] to disseminate materially misleading and inaccurate information to its shareholders," *Jeffers*, R. 21 ¶ 96; "failed to exercise due care to prevent the disastrous Recapitalization and 2012 Offering which substantially diluted the value of the pre-2012 Offer holdings," *Sadler*, R. 1 ¶ 94; and "set[] the price at which RPAI sold shares to existing shareholders pursuant to the DRP at an inflated level," *Babin*, R. 1 ¶ 69.

Section 2-401(a) of the Maryland Corporations and Associations Article states that "[t]he business and affairs of a corporation shall be managed under the direction of a board of directors." Md. Code Ann., Corps. & Ass'ns § 2-401(a). Section 2-405.1, entitled "Standard of care required of directors," describes the duty of care directors and officers owe when undertaking those managerial decisions. It provides:

> (a) A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
>
> > (1) In good faith;
> >
> > (2) In a manner he reasonably believes to be in the best interests of the corporation; and
> >
> > (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

21

§ 2-405.1(a); *see Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 419 (Md. 2009). Additionally, in *Shenker*, the Maryland Supreme Court held for the first time since the codification of § 2-405.1 that corporate directors may owe additional fiduciary duties to shareholders when the directors are acting outside the scope of their managerial duties, including the duties of candor and maximization of shareholder value. 983 A.2d at 419-20. An example of when directors are acting outside the scope of managerial duties is when they are "negotiating the price that shareholders will receive for their shares in a cash-out merger transaction." *Id.* at 414. In that situation, the corporate directors "remain directly liable to the shareholders for *any* breach of fiduciary duty," as opposed to when a claim is brought pursuant to the duties set forth in § 2-405.1(a). *Id* (emphasis added).

Claims that are brought pursuant to the duties codified in § 2-405.1(a) belong to the corporation and may only be brought in a derivative action. *See* § 2-405.1(g) ("Limitation on enforceability. — Nothing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation."); *Shenker*, 983 A.2d at 424. Thus, only claims based on fiduciary duties *not* codified in § 2-405.1(a), as well as claims that allege harms that are separate and distinct from any to the corporation, may be brought in a direct cause of action against corporate directors. Additionally, if a claim is based on a duty found § 2-405.1(a), then the business judgment rule applies, and corporate directors are afforded a presumption of reasonableness in their actions. *See* 2-

405.1(e) ("Presumption of satisfaction. — An act of a director of a corporation is presumed to satisfy the standards of [§ 2-405.1(a)]). On the other hand, if a common law fiduciary duty forms the basis of a shareholder's claim—one *not* codified in § 2-405.1(a)—then the business judgment rule does not apply.

The Individual Defendants describe a number of reasons why the breach of fiduciary duty claims against them should be dismissed, including that they did not owe certain fiduciary duties to the Plaintiffs, the Plaintiffs lack standing, the claims are barred under § 2-405.1(g), and the complaints fail to rebut the presumption that their actions were reasonable under the business judgment rule. Courts have dismissed breach of fiduciary claims under Maryland law for all of these reasons. *See, e.g.*, *Allyn v. CNL Lifestyle Props., Inc.*, No. 13-cv-132, 2013 WL 6439383, at *3-6 (M.D. Fla. Nov. 27, 2013) (dismissing the claims because the plaintiff failed to rebut the business judgment rule); *Becker v. Inland Am. Real Estate Trust, Inc.*, No. 13 C 3128, 2013 WL 6068793, at *4-6 (N.D. Ill. Nov. 18, 2013) (concluding that only the duties in § 2-405.1(a) applied and dismissing the case because the plaintiff failed to rebut the business judgment rule); *Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249, 261-62 (S.D.N.Y. 2010) (dismissing the claims because the plaintiff lacked standing to bring a direct suit against the corporate directors). The courts' divergent paths are due to the relative recency of *Shenker*, undeniably the seminal case on Maryland breach of fiduciary duty claims. The Court here will address what fiduciary duties were owed to the Plaintiffs, whether the Plaintiffs have standing to bring the claims, and finally, when applicable, whether the Plaintiffs have set forth

sufficient allegations to overcome the business judgment rule as codified in § 2-405.1(e).

### 1. Fiduciary Duties Owed to the Plaintiffs

Each of the five complaints refers to the duty to "maximize shareholder value" or the duty of "candor." *See Sadler*, R. 1 ¶ 94; *Babin*, R. 4 ¶¶ 68-69; *Schnierson*, R. 1 ¶ 49; *Olive*, R. 1 ¶ 69: *Jeffers*, R. 21 ¶ 96. Neither of these duties is codified in § 2-405.1(a). *See Shenker*, 983 A.2d at 420-22. The Individual Defendants contend that the transactions at issue here did not implicate these additional duties. There is no debate that the Plaintiffs allegations do not arise from a change of control or cash-out merger transaction, which was the factual event underlying the *Shenker* decision. Indeed, most of the courts that have interpreted *Shenker* have held that the duties outside § 2-405.1(a) *only* arise in a "change of control" transaction. *See Stender v. Caldwell*, No. 07-cv-02503-REB-MJW, 2010 WL 1930260, at *4 (D. Colo. May 12, 2010) (explaining that *Shenker* arises in "a very narrow context—specifically, that of a cash-out merger when the decision to sell the corporation already has been made"); *Consortium Atl. Realty Trust, Inc. v. Plumbers & Pipefitters Nat'l Pension Fund*, No. 365879-V, 2013 WL 605865, at *6 (Md. Cir. Ct. Feb. 5, 2013) ("*Shenker* is limited, until the Court of Appeals says otherwise, to 'a cash-out merger when the decision to sell the corporation has already been made.'" (quoting J. HANKS, MARYLAND CORPORATION LAW § 6.6A at 192 (2012 Supplement)); *In re Nationwide Health Props., Inc., S'holder Litig.*, No. 24-C-11-001476, 2011 WL 10603183, at *7 (Md. Cir. Ct. May 27, 2011) ("This Court has

found no support in *Shenker*, or in any of the other authorities cited by Plaintiffs, to impose the duty to maximize shareholder value outside of a 'cash-out' or change of control situation—that is, a change of control merger that effectively eliminates the shareholders' interests in the target company.").

The court in *Becker* examined the reasoning behind the *Shenker* decision, stating the relevant question was whether the director defendants were "acting in a managerial capacity" when establishing the price per share to be sold. *Becker*, No. 2013 WL 6068793, at *4. If they were acting in a managerial capacity, then only the duties under 2-405.1(a) applied. The court went on to determine that § 2-405.1(a) applied. *See id.* ("The Prospectus made it perfectly clear that the price set by the Board was at best an estimate; that the real value could be higher or lower than the established price. It would appear, therefore, that in setting the share sale price the Board Defendants owed Plaintiffs only the obligations set forth in § 2-405.1.").

The Plaintiffs' rely on *Parish v. Maryland & Virginia Milk Producers Association, Inc.*, 242 A.2d 512, 539 (Md. 1968), to argue that a duty of disclosure and candor was implicated in the transactions at issue here. But *Parish* was decided long before the codification of § 2-405.1 and before *Shenker*—the standard for breach of fiduciary claims under Maryland law—was decided. As such, the only duties the Individual Defendants owed to the Plaintiffs in circumstances that did not include a "change of control" are those elucidated in § 2-405.1, i.e., the duties of good faith, loyalty, and care. *See, e.g.*, *Hohenstein v. Behringer Harvard Reit I, Inc.*, No. 3:12-CV-4842-G, 2014 WL 1265949, at *5 (N.D. Tex. Mar. 27, 2014) ("To date,

*Shenker*'s holding has been limited to its narrow set of circumstances, and courts have not imposed a fiduciary duty of candor in other situations."). The complaints do not allege a change of control situation here, so only the duties set forth in § 405.1(a), which are subject to the business judgment, apply.

### 2. Standing

The Individual Defendants also maintain that the Plaintiffs lack standing to bring these claims because the duties in § 2-405.1(a) are only enforceable "by the corporation or in the right of the corporation." § 2-405.1(g). They argue that the claims are barred because the Plaintiffs brought this as an individual action, as opposed to a derivative action on behalf of the corporation. Few courts have decided a motion to dismiss on the ground that the claim is barred under § 2-405.1(g), instead choosing to focus on the allegations in light of the presumption of reasonableness afforded to the actions of corporate directors. *Compare Seidl*, 713 F. Supp. 2d at 256-57 (dismissing the breach of fiduciary duty claim because it belonged to the corporation, pursuant to § 2-405.1(g)), *with Allyn*, 2013 WL 6439383, at *3-6 (dismissing the claim because the plaintiffs failed to provide factual allegations rebutting the business judgment rule); *and Becker*, 2013 WL 6068793, at *4-6 (same). In fact, in *Jolly Roger Fund LP v. Sizeler Property Investors, Inc.*, No. Civ. RDB 05-841, 2005 WL 2989343, at *4-6 (D. Md. Nov. 3, 2005), a case involving a direct suit against the company and its directors, the court did not even address § 2-405.1(g), only looking to whether the shareholders had suffered a direct injury and then concluding they had not. This was similar to the

approach taken in *Danielewicz v. Arnold*, 769 A.2d 274, 282-83 (Md. Ct. Spec. App. 2001), a case involving a lawsuit brought individually and derivatively, in which the court of special appeals affirmed the trial court's dismissal of the breach of fiduciary duty claims without addressing § 2-405.1 at all—let alone § 2-405.1(g).

The Plaintiffs contend they have standing despite the application of § 2-405.1(g) because shareholders may bring a direct suit when the harm they suffered is separate and distinct from any harm to the corporation. *See Mona v. Mona Elec. Group, Inc.*, 934 A.2d 450, (Md. Ct. Spec. App. 2007) ("A shareholder may bring a direct action . . . [when] he has suffered 'an injury that is separate and distinct from any injury suffered either directly by the corporation or derivatively by the stockholder because of the injury to the corporation.'" (quoting James J. Hanks, Jr., *Maryland Corporation Law* 183 (Aspen 2005)). Their argument is essentially that a "direct injury" claim circumvents the application of § 2-405.1(g). In support, they primarily rely on one particular passage in *Shenker*:

> In contrast to a derivative action, a shareholder may bring a direct action, either individually or as a representative of a class, against alleged corporate wrongdoers when the shareholder suffers the harm directly or a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation.

*Shenker*, 983 A.2d at 424.

That quote is taken out of context. The *Shenker* court definitively held that § 2-405.1(g) "plainly means that, to the extent § 2-405.1 creates duties on directors such as the duty of care contained in § 2-405.1(a), those duties are enforceable only by the corporation or through a shareholders' derivative action." *Shenker*, 983 A.2d

at 426. Put simply, if a suit is based on duties contained in § 2.405.1(a), it does not matter whether the Plaintiffs suffered a direct injury; the claims can only be brought through a derivative suit. The Plaintiffs have not provided this Court with any authority since *Shenker* demonstrating that a direct claim predominates over the application of § 2-405.1(g), and the Court has been unable to find any. Situations may be imagined where a plaintiff suffers a direct injury as a result of a breach of a fiduciary duty codified in § 2-405.1(a). For example, a corporate director who engages in self-dealing—a breach of the duty of loyalty—that results in the dilution of a shareholder's voting power. *See Shenker*, 983 A.2d at 424 ("Where the rights attendant to stock ownership are adversely affected, shareholders generally are entitled to sue directly, and any monetary relief granted goes to the shareholder."). But under present Maryland law, the application of § 2-405.1(g) trumps any allegation that a shareholder suffered a direct injury, and a direct action in those circumstances is not proper. [14]

The Court has already determined that the duties of candor and maximization of share value were not owed to the Plaintiffs, so the only fiduciary duty claims remaining were required to be brought by RPAI or derivatively on its behalf. *See Seidl*, 713 F. Supp. 2d at 256-57 (citing § 2-405.1(g)). They were not. The

---

[14] Even if allegations of a direct injury could circumvent the application of § 2-405.1(g), the Plaintiffs have not sufficiently alleged a direct injury here, so the argument would still fail. *See Danielewiz*, 769 A.2d at 283 ("Generally, . . . a stockholder cannot maintain an action at law against an officer or director of the corporation to recover damages for fraud, embezzlement, or other breach of trust which depreciated the capital stock or rendered it valueless.").

Plaintiffs' breach of fiduciary duty claims are therefore dismissed for lack of standing.

### 3. Business Judgment Rule § 2-405.1(e)

Although the breach of fiduciary claims fail for the reasons stated earlier, the Court will nonetheless address the Individual Defendants' additional argument that the Plaintiffs have not alleged facts to overcome the business judgment rule, as codified in § 2-405.1(e). *See generally Stanziale v. Nachtomi*, 416 F.3d 229, 238 (3rd Cir. 2005) (explaining that a plaintiff "must plead around the business judgment rule"). The business judgment rule insulates most business decisions made by corporate directors from judicial review. *Boland v. Boland*, 31 A.3d 529, 548 (Md. 2011). The Delaware Supreme Court has described it as follows:

> It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith[,] and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

*Id.* (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)); *see generally Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 405 (S.D. Tex. 2008) (explaining that the business judgment rule consists of four elements: "(1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith"). In *Becker* and *Allyn*, the courts dismissed fiduciary duty claims brought against corporate directors because the facts alleged did not overcome the business judgment rule. *See Allyn*, 2013 WL 6439383, at *3-6; *Becker*, 2013 WL 6068793, at *4-6. Those cases

involved allegations similar to those alleged here—including, that the directors inflated the share price, knowingly disseminated false information, and improperly managed the company. *See, e.g.*, *Sadler*, R. 1 ¶ 94; *Babin*, R. 1 ¶ 69; *Schneirson*, R. 1 ¶ 49; *Olive*, R. 1 ¶ 69; *Jeffers*, R. 21 ¶ 96. Thus, the reasoning those courts employed is applicable.

Just as in *Becker* and *Allyn*, the business judgment rule applies here because the Plaintiffs have alleged a violation of duties protected by § 2-405.1(e). The *Sadler* Plaintiffs allege that the Individual Defendants breached their "duties and obligations of ordinary care by, among other things, offering investments in the Inland Western REIT without having obtained a fairness opinion; failing to discontinue the disastrous Recapitalization and 2012 Offering when it became apparent that such an offering would substantially damage the pre-2012 Offering shareholders; and materially diluting the investment value of the pre-2012 Offering shares of the REIT." *Sadler*, R. 1 ¶¶ 95-96. The *Babin* Plaintiffs allege that the Individual Defendants breached their fiduciary duties of "due care, loyalty, good faith, and candor" by "making misstatements and omissions of fact concerning the true value of RPAI shares sold to RPAI's existing shareholders pursuant to the DRP, and by setting the price at which RPAI sold shares to existing shareholders pursuant to the DRP at an inflated level . . . ." *Babin*, R. 4 ¶¶ 68-69. Additionally, the *Schnierson*, *Olive*, and *Jeffers* Plaintiffs allege that the "Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing [RPAI] to disseminate materially misleading and inaccurate information to

30

stockholders through, *inter alia*, SEC filings and other public statements and disclosures . . . ." *Schnierson*, R. 1 ¶ 49; *Olive*, R. 1 ¶ 69; *Jeffers*, R. 21 ¶ 96.[15]

The *Becker* and *Allyn* courts acknowledged the business judgment rule's relevance. "Maryland law presumes that a director of a corporation satisfies the standards of § 2-405.1(a) and immunizes a director who performs his or her duties in accordance with the standards provided in § 2-405.1(a) from liability." *Allyn*, 2013 WL 6439383, at *4 (citing § 2-405.1(c), (e)). "The burden is on the party challenging the decision to establish facts rebutting the presumption that the directors acted reasonably and in the best interests of the corporation." *Bender v. Schwartz*, 917 A.2d 142, 153 (Md. App. 2007) (quoting *Aronson*, 473 A.2d at 812) (internal quotation marks omitted). Neither "mere suspicions" nor "conclusory terms" will suffice. *Bender*, 917 A.2d at 151-53.

Using that standard, the *Becker* court examined "whether the alleged inflation of the share price on the four occasions charged by Plaintiffs would support a finding of a breach of the duty of loyalty and good faith." *Becker*, 2013 WL 6068793, at *5. The court concluded it did not because the board of directors set the price as an estimate, meaning it could be higher or lower, and "repeatedly made all of the disclosures required of it by the Securities Exchange Act of 1934, including quarterly reports . . . contain[ing] complete and detailed financial information." *Id.* This was the same conclusion reached in *Allyn*, which acknowledged that the facts

---

[15] None of the parties explicitly allege what misstatements and omissions of fact were made or what materially misleading and inaccurate information was conveyed, let alone when or under what circumstances this occurred.

presented were "strikingly similar" to those in *Becker*. *Allyn*, 2013 WL 6439383, at *5. The same conclusion is required here, as the shareholders were all cautioned that the shares prices were estimates and all required SEC filings were made.

The Plaintiffs' complaints do not contain factual allegations that are "sufficient to rebut the presumption that the [Individual Defendants] acted in good faith, in a manner they reasonably believed to be in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." *See Allyn*, 2013 WL 6439383, at *4; *see also Becker*, 2013 WL 6068793, at *4-5. Initially, the *Babin* Plaintiffs find fault with the $6.85 to $10.00 DRP share price, but these are generalized "suspicions" that the price of shares in the DRP was inflated. *See, e.g.*, *Hohenstein*, 2014 WL 1265949, at *6 ("The plaintiffs insist that the DRP pricing was still somehow reckless and misleading, but the court—along with other courts that have considered similar offerings—disagrees. The plaintiffs have alleged nothing more than 'mere suspicions.'") (internal citations omitted). They have not provided the Court with allegations sufficient to support a conclusion that this *estimated* price was not in line with what an ordinarily prudent person would have used in a like position and under similar circumstances. The same goes for the *Sadler* Plaintiffs' allegations that the 2012 Offering price was too low and that the Recapitalization was not in RPAI's best interests. The *Jeffers*, *Olive*, and *Schnierson* Plaintiffs contend that certain information was "misleading and inaccurate"; however, the gravamen of this contention is that they now find fault with the Individual Defendants'

recommendation that the Plaintiffs reject the mini-tender offers. Again, this is an issue regarding share valuation. Each of these allegations involves an inherent difficulty in ascertaining the true value of unlisted REIT shares. That is why RPAI included numerous disclaimers in all of its correspondence with its shareholders regarding its estimated value, including the following illustrative example taken directly from the *Babin* complaint:

> The *estimated value* was determined by the use of a combination of different indicators and an internal assessment of value utilizing a common means of valuation under the direct capitalization method as of December 31, 2009. No independent appraisals were obtained. As there is no established public trading market for our shares of common stock, this *estimated value* may not reflect the actual market value of your shares on any given date; and there can be no assurances that stockholders would receive $6.85 per share for their shares if any such market did exist, that the estimated value reflects the price or prices at which our common stock would or could trade if it were listed on a national stock exchange or included for quotation on a national system, or that stockholders will be able to receive such amount for their shares at any time in the future.

*Babin*, R. 1 ¶ 39 (January 27, 2010 letter to the shareholders in a Form 8-K filed with the SEC) (emphasis added).

Numerous courts have expressed criticism of the type of Monday-morning quarterbacking the Plaintiffs engage in—i.e., calculating the value of shares of common stock in an unlisted REIT at a later point in time. The court in *Apple REITS* explained:

> As Defendants note, the nine different metrics by which Plaintiffs claim that the REITS' actual value can be ascertained each produce different results, underscoring the impossibility of calculating the REITs' value, or any other investment's value, with empirical certainty.

These realities and inherent difficulties in ascertaining the value of REIT shares necessarily means that investment valuations "can only fairly be characterized as subjective opinions."

*In re Apple REITS Litig.* ("*Apple REITS*"), No. 11-CV-2919 KAM, 2013 WL 1386202, at *14 (E.D.N.Y. Apr. 3, 2013) (quoting *In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989, 2011 WL 31548, at *8 (S.D.N.Y. Jan. 5, 2011)). Pointing to a given share's price on a nationally-traded market that differs from an estimated value at an earlier point in time does not by itself demonstrate a violation of a defendant's fiduciary duty. The Plaintiffs must put forth a factual allegation that demonstrates the Individual Defendants' conduct regarding the 2012 Offering, the Recapitalization, the DRP, or the mini-tender offers and the corresponding estimated values assigned to the shares was so intentionally improper or grossly negligent that an ordinary, prudent person in their position would not have in such a manner. *See Miller v. U.S. Foodservice, Inc.*, 361 F. Supp. 2d 470, 477 (D. Md. 2005) (explaining that the business judgment rule "can be overcome by allegations of gross negligence"); *see also Werbowsky v. Collomb*, 766 A.2d 123, 144 (Md. 2001) ("[Directors] enjoy the benefit and protection of the business judgment rule, and their control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing."). Even then, however, "obviously wrong" estimations on value still might not rise to the level of a breach of fiduciary duty. *See Becker*, 2013 WL 6068793, at *5

The Plaintiffs can avoid the business judgment rule by "show[ing] either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment." *Boland*, 31 A.3d at 549 (quoting *Bender*, 917 A.2d at 152). Yet, the complaints provide no factual allegations demonstrating that the Individual Defendants were not acting in the best interests of the corporation or that they acted on an uninformed basis. For example, the allegations demonstrate the Individual Defendants received the mini-tender offers, considered them, and rejected them based on the "the use of a combination of different indicators and an internal assessment of value utilizing a common means of valuation under the direct capitalization method[.]" *See, e.g.*, *Schnierson*, R. 1 ¶ 37. This was reasonable despite any allegation that an "independent appraisal" was never taken. *See, e.g.*, *id*. The Plaintiffs have not directed the Court to any requirement that RPAI obtain an independent appraisal, and the Form 8-Ks even disclosed that none ever occurred. Even the *Olive* and *Schnierson* Plaintiffs concede in their response that the Individual Defendants "indisputably had all information necessary" to make a valuation of the REIT shares. *Sadler*, R. 84 at 11.

Furthermore, there is no plausible allegation that the Individual Defendants personally benefited from an inadequate offering price, a 10-to-1 reverse stock split, or an inflated DRP price. It was in the best interests of everyone—i.e., the company, the Board members, and the shareholders—for the shares to be sold at a higher rate, but not at a rate that overvalued the company. There are no allegations that

35

demonstrate the Individual Defendants and the Plaintiffs did not have a commonality of interest regarding the value of the shares. Nor do the mini-tender offers themselves establish that the Individual Defendants breached their fiduciary duties of care. S*ee Allyn*, 2013 WL 6439383, at *4 ("The mere facts that secondary market transactions in CLP shares occurred at prices below $9.50 and that CMG Partners offered CLP shareholders $4.50 and $4.75 per share in two mini-tender offers do not themselves establish that the Director Defendants breached their fiduciary duties of care."). The *Becker* court said it best: "The mere act of a Board, exercising its managerial power to establish a price for its stock, even if obviously wrong, would not amount to a breach of fiduciary duty owed to its shareholders. The Plaintiffs' theory of liability is not only implausible but *non-existent*." *Becker*, 2013 WL 6068793, at *5 (emphasis added). This Court finds that conclusion applicable here.

Moreover, like in *Becker*, there is no allegation that the Individual Defendants failed to make all of the required disclosures, including those required by the Securities Exchange Act of 1934. *See id*. The five complaints and their attachments make clear that numerous required regulatory filings were made on behalf of RPAI, as well as numerous communications with shareholders. Additionally, all of those documents included a qualifier that the stated values were "estimated values" and that the "estimated value may not reflect the actual market value of [the] shares on any given date." *See, e.g.*, *Jeffers*, R. 21 ¶¶ 66-67. This information cuts directly against the Plaintiffs' fiduciary duty claims because it

demonstrates that the Individual Defendants had adequate information to consider and did consider it, the Individual Defendants satisfied their disclosure obligations, and the Plaintiffs easily could have used the information they received to make their own adequate assessment of the stock price. The fact the Plaintiffs regret having bought or held on to their shares in light of the numerous disclosures cannot be the basis for a breach of fiduciary duty claim.

Several of the complaints raise an additional issue, alleging that the Individual Defendants "misrepresented the value of the Inland REIT's shares in tender offers in order to dissuade shareholders from tendering." *See Olive*, R. 1 ¶ 69. It is alleged that, in doing so, they "placed their own individualistic motivations and objectives above their collective duty to act in good faith and with reasonable skill and prudence." *Id.*; *see Sadler*, R. 84 at 11 (arguing in their response brief that certain directors had special relationships with the Inland Group or its affiliates). This allegation that touches upon the duty of loyalty, which encompasses two related, albeit separate requirements: (1) corporate directors must decide matters independently when exercising their judgment, and (2) directors are generally not permitted to have a "material personal interest" in a transaction. *Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383, at *11 (Md. Cir. Ct. Apr. 1, 2004)). The Plaintiffs contend that they have alleged facts sufficient to overcome the business judgment rule because they can show "that a majority of [the] board that approved the transaction in dispute was interested and/or lacked independence." *Sadler*, R. 84 at 9 (quoting *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002)).

37

The Plaintiffs' allegations on this point are insufficient for a number of reasons. First, the Plaintiffs allege that the Individual Defendants "ha[d] a substantial interest in keeping the Company independent" and recommending that the shareholders reject the mini-tender offers, presumably so they could continue to receive compensation for being corporate officers or directors. *Olive*, R. 1 ¶ 53. Of course, corporate officers and directors are often compensated for their services or role within a corporation, including through director fees and stock options. However, conclusory allegations that a corporate director has an interest in a transaction and is not independent simply because he receives compensation for his board services and might not be retained if there is a change in management are not enough to make a plausible allegation of interest. *Werbowsky*, 766 A.2d at 139 ("[I]nterest or dependence may not be found merely from the fact that directors are paid for their services or on speculative, non-specific allegations that they acted in order to secure their retention as directors.").

The duty of loyalty also focuses on whether the *board* was interested in the outcome of a transaction or lacked the independence to objectively assess the transaction. *See Orman*, 794 A.2d at 22-23. If all shareholders, including the directors who own shares, *equally benefit* from a transaction, there is no prohibited director "interest" in a transaction. *See id.* at 29-30 (stating that "a director is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders"). Accordingly, the allegation that the Individual Defendants could "monetize a large quantity of

Company stock" as a result of the 2012 Offering and Recapitalization is likewise insufficient to show a lack of disinterest because *all* shareholders received the same added liquidity for their shares—i.e., everyone now had shares that were listed on the NYSE, an established open market. *See* R. 84 at 3. The benefit to the director shareholders from the 2012 Offering and Recapitalization was the same as that received by all shareholders generally.

RPAI had a relationship with the Inland Group, which the Plaintiffs allege resulted in "certain lucrative transactions" between the parties involving over $15,000,000 between 2009 and 2011 alone. *Olive*, R. 1 ¶ 54. These transactions purportedly included RPAI leasing office space from "an Inland Group affiliate," as well as an "ongoing service arrangement" that includes "an Inland Group affiliate serving as a registered investment advisor[] to [RPAI] in exchange for a monthly fee of up to one percent per annum of the aggregate fair value of [RPAI's] assets invested; an Inland Group affiliate providing loan servicing; and an Inland Group affiliate providing legal services." *Id.* The Plaintiffs further allege that non-parties Daniel Goodwin and Robert D. Parks, and Defendant Brenda Gujral[16] are "significant shareholders and/or principals of the Inland Group or holder of directorships and are executive officers of the Inland Group"; that Goodwin owned 5% of RPAI's shares; and that Parks and Gujral were at one point on RPAI's board. *Id.* But even if Parks and Gujral alone could be considered interested parties or as

---

[16] For clarity, the Court is specifically addressing the allegations in the *Olive* complaint, yet Gujral is only named as a defendant in the *Babin* case.

lacking independence during their time on the board, that conflict does not necessarily translate to the other board members. *See Orman*, 794 A.2d at 27. Furthermore, Parks and Goodwin are not defendants in this case, and the Plaintiffs need to present factual allegations that other members of the board were either (1) "self-dealing" or (2) controlled by or beholden to another party. *Id.* 23-24. They have not done so, as "naked assertions" that parties had a business relationship will not overcome the presumption of a director's independence. *See id.* at 27. This becomes apparent when the allegations set forth here are compared to the allegations in cases where the court has found either board interest in a transaction or complete lack of independence.

In *Hollinger International, Inc. v. Hollinger Inc.*, No. 04 C 698, 2005 WL 589000, at *28-29 (N.D. Ill Mar. 11, 2005), the court denied the motion to dismiss because the plaintiff alleged that the controlling shareholders "personally dictated" the corporate director's compensation as a CEO of another company and paid him over $3,100,000 in "incentive payments" even though the other company had lost $68,000,000. In *Seidel v. Byron*, 405 B.R. 277, 290-91 (N.D. Ill. 2009), the defendants were serving as directors of multiple related entities "to whom they owed conflicting fiduciary duties" and were operating one of the entities solely to benefit another. In *Ad Hoc Community of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 558-59 (Del. 2008), the complaint primarily alleged that the defendant was a majority shareholder in each of the companies involved in the transactions, and therefore, the defendant was on both sides of the deals. In

each of these cases, there were detailed allegations that could legitimately support a conclusion that the voting board members were improperly biased in some way. None of these scenarios is present here. So again, even assuming Goodwin, Parks, and Gujral could be considered "interested" (and discounting the fact Goodwin was never a board member), the "particularized facts" alleged do not support a "reasonable inference" that any of the three individuals were controlling shareholders of RPAI who applied wielding pressure to the other board members or that any of the Individual Defendants were beholden to another through a close personal, family, or business relationship such that the board's independence was ever in question.

The Court is mindful that "[t]he totality of the complaint's allegations need only support a *reasonable doubt* of business judgment protection, not a judicial finding that the directors' actions are not protected by the business judgment rule." *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 726 (7th Cir. 2013) (quoting *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 809 (7th Cir. 2001)) (alteration in *Westmoreland* and internal quotation marks omitted). Nevertheless, the Plaintiffs' breach of fiduciary duty claims are alternatively dismissed because their factual allegations do not provide enough detail to overcome the presumption of reasonableness afforded to the Individual Defendants' actions under the business judgment rule.

### 4. *Schnierson* – Counts III & IV

The *Schnierson* complaint contains a count for "Abuse of Control" and another for "Gross Mismanagement" against the Individual Defendants. *Schnierson*, R. 1 ¶¶53-60. The Plaintiffs do not provide any basis for these counts to stand as independent causes of action. Rather, they claim the Individual Defendants "abused their positions of authority" and "breached their duties of due care, diligence, and candor" in their management and administration of RPAI. *Id.* ¶¶ 54, 60. These additional conclusory allegations are unhelpful because they are just another way of describing how the Individual Defendants allegedly breached their fiduciary duties. *See E. Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000) (explaining that "[t]here is nothing to be gained by multiplying the number of torts" and that "[l]aw should be kept as simple as possible"). Characterizing Counts III and IV of the *Schnierson* complaint as something other than a breach of fiduciary duty does not change the underlying legal theory. They are therefore dismissed for the same reasons the counts explicitly labeled "breach of fiduciary" are dismissed.

### B. Ameriprise: *Jeffers* – Count II

The *Jeffers* Plaintiffs' complaint borrows much of its language for this count against Ameriprise from the breach of fiduciary duty count against the Individual Defendants. *Compare Jeffers*, R. 21 ¶¶ 98-100, *with id.* ¶¶ 95-96. It is difficult to determine exactly what they are alleging, especially considering (1) that the counts are based on different states' laws—the Individual Defendants counts are brought

under Maryland common and statutory law; this count under Illinois common law; and (2) that the complaint often conflates what it considers to be a "duty" with what is in actuality a "breach" of the duty.[17] Nevertheless, to state a claim for breach of fiduciary duty under Illinois law, a plaintiff must allege three elements: (1) "that a fiduciary duty exists"; (2) "that the fiduciary duty was breached"; and (3) "that such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000). The Plaintiffs allege that Ameriprise owed the Plaintiffs the duties of care, loyalty, and good faith; that Ameriprise breached those duties by disseminat[ing] materially misleading and inaccurate information," "failing to disclose hidden fees it was earning," and "failing to perform the required due diligence" required; and that as a result, the Plaintiffs were damaged. *Jeffers*, R. 21 ¶¶ 17, 100.

Some of those allegations directly implicate Rule 9, which requires fraud claims to be pled "with particularity." *See Tellabs, Inc.*, 551 U.S. at 313. The Plaintiffs allege that Ameriprise:

- "conveyed inconsistent and misleading statements regarding the expected investment returns."
- "engaged in further deceit in an attempt to manipulate the value of the shares held by its customers."

---

[17] The *Jeffers* complaint alleges that Ameriprise had a duty to disseminate accurate, truthful, and complete information; a duty to perform "due diligence," and fiduciary duties of care, loyalty, and good faith. *Jeffers*, R. 23 ¶¶ 98-100. In actuality, the allegations regarding a failure to disseminate information and perform due diligence are how Ameriprise allegedly violated its fiduciary duties of care, loyalty, and good faith—i.e., they are not independent duties upon which a cause of action is based.

- "engaged in Account Statement Identifier Deception (ASID). ASID occurs when an account statement identifier is either added or removed to mislead the investor[.]"

- created a scheme to "deceive a client into believing that they actually began with a lesser amount, thus creating the impression that the losses suffered by REIT were less than what they actually were."

- "engaged in further intentional deception willful ignorance when it allowed Inland Western to recalculate the value of its shares."

*Jeffers*, R. 21 ¶¶ 23, 85, 86, 91, 92. Thus, Count II is more than just a basic fiduciary duty claim, as it states that Ameriprise "had a duty to disseminate accurate, truthful, and complete information to Plaintiff and the proposed classes," *Jeffers*, R. 21 ¶ 98, which is in essence a common-law fraud claim. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) ("In Illinois, as elsewhere, the elements of a common-law fraud claim are: '(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.'" (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996)). This does not necessarily convert the claim(s) into a *federal* securities fraud claim, however, as Ameriprise contends. *Jeffers*, R. 47-1 at 10; *see Baxi v. Ennis Knupp & Assoc.*, No. 10 C 6364, 2011 WL 3898034, at *5-12 (N.D. Ill. Sept. 2, 2011) (dismissing claims for breach of fiduciary duty and fraudulent inducement under Illinois law, *in addition* to a separate claim for violation of Section 10(b) of the Securities Exchange Act of 1934). It simply means that the allegations containing averments in fraud in

Count II of the *Jeffers* complaint must meet the heightened pleading requirements of Rule 9(b). *See Gandhi, LLC*, 689 F. Supp. 2d at 1013.

Ameriprise argues that the count should be dismissed because the allegations do not satisfy the required elements for a breach of fiduciary duty claim. The Court begins its analysis by looking to the first element, the existence of a fiduciary duty. Whether a party owes a fiduciary duty to another depends on the relationship between the parties. A fiduciary relationship is shown when a party establishes "facts showing an antecedent relationship that gives rise to trust and confidence reposed in another." *Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 1041 (Ill. 2012). Ameriprise contends that it did not owe any fiduciary duties to the Plaintiffs because it could only make investment decisions on the Plaintiffs' behalf with the Plaintiffs' approval, *Jeffers*, R. 47-1 at 4, but this argument ignores the essence of the *Jeffers* complaint. The complaint alleges that the Plaintiffs paid "syndication management" fees for Ameriprise's services, in addition to a 1% non-accountable "due diligence" fee and commissions "ranging from 7% to 9% for selling the [RPAI stock]," and Ameriprise provided various materials to the plaintiffs in order to educate them and "encourage them to invest . . . money in certain financial products." *Jeffers*, R. 21 ¶¶ 17-32, 80-81. Taking these allegations as true and drawing all inferences in favor of the Plaintiffs, the transactions at issue were more than an "ordinary arm's length business transaction" between sophisticated businessmen; a trusting relationship between the parties was arguably formed. *But see Maguire v. Holcomb*, 523 N.E.2d 688, 691 (Ill. App. Ct. 5th Dist. 1988)

(concluding that no fiduciary relationship existed between the parties because the defendant did not "accept[] plaintiffs' trust and confidence" and it "was no more than an ordinary arm's-length business transaction"). Ameriprise cites certain cases discussing the "narrow" duty owed to a customer who holds a nondiscretionary account with a broker-dealer. *See Jeffers*, R. 60 at 3 (citing, e.g., *ADM Investor Servs., Inc. v. Collins*, No. 05 1823, 2006 WL 224095, at *6-7 (N.D. Ill. Jan. 26, 2006); *Refco, Inc. v. Troika Inv. Ltd*, 702 F. Supp. 684, 687 (N.D. Ill. 1988); *First Am. Discount Corp. v. Jacobs*, 756 N.E.2d 273, 284-85 (Ill. App. Ct. 1st Dist. 2001); *Index Futures Grp., Inc. v. Ross*, 557 N.E.2d 344, 348 (Ill. App. Ct. 1st Dist. 1990)). The Plaintiffs' allegations nevertheless illustrate that Ameriprise played a significant role in the Plaintiffs' decision to purchase shares of RPAI. Thus, the Plaintiffs have made sufficient factual allegations that could support the existence of a fiduciary relationship between Ameriprise and the Plaintiffs. *See Khan*, 978 N.E.2d at 1041 (describing allegations supporting a conclusion that the "defendants had superior knowledge and influence over [the plaintiff] and that he relied on them to give him sound investment and tax advice").

As to the second element of a breach of fiduciary duty claim, the Plaintiffs have adequately alleged numerous breaches. The allegation that Ameriprise failed to disclose its relationship with RPAI and that it failed to perform due diligence checks on the soundness of investing in RPAI would each qualify as a breach of a fiduciary duty owed to the Plaintiffs.

The third element of a breach of fiduciary claim, i.e., whether the breach alleged proximately caused any damage to the Plaintiffs, is where the complaint is wanting. As the Seventh Circuit has stated, "'Loss causation' is an exotic name— perhaps an unhappy one—for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990) (internal citation omitted). Although "loss causation" is more often applied to statutory fraud claims, it is still relevant to common law tort claims relating to any investment decision. The Plaintiffs have alleged numerous breaches—some sounding in negligence, others in fraud—yet they fail to connect any of the breaches to any damages. *Cf. id.* ("But [the plaintiffs] suggest no reason *why* the investment was wiped out. They have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one."). If Ameriprise failed to disclose a conflict of interest—e.g., that it was earning fees from RPAI (a negligence claim), there still needs to be some allegation building a bridge between the breach and the harm alleged to have occurred. *See Huang v. Brenson*, 7 N.E.2d 729, 739 (Ill. App. Ct. 1st Dist. 2014) ("The existence of an undisclosed conflict of interest only satisfies the breach element, but not the causation element, of a breach of fiduciary duty."). If Ameriprise engaged in Account Statement Identifier Deception ("ASID") to mislead investors (a fraud claim),[18] the question as to whether the plaintiffs were

---

[18] The *Jeffers* Plaintiffs allege that "ASID occurs when an account statement

harmed by *that* breach still remains. Furthermore, even if Ameriprise acted negligently by failing to conduct a due diligence check on the viability of RPAI as an investment, which negligently or intentionally led to Ameriprise disseminating materially misleading and inaccurate information, the Plaintiffs must still link that breach to some particular harm to them. *See Erica P. John Fund, Inc. v. Halliburton Co.*, ___ U.S. ___, 131 S. Ct. 2179, 2183 (2011) (noting that plaintiffs "must demonstrate [in claims involving securities fraud] that the defendant's deceptive conduct caused their claimed economic loss"); *Lutkauskas v. Ricker*, 998 N.E.2d 549, 560 (Ill. App. Ct. 1st Dist. 2013) (dismissing the case because the Plaintiffs failed to allege damages supporting their negligence claim for breach of fiduciary duty).

Here, the Plaintiffs have not alleged that they would not have bought RPAI shares "but for" the information they received from Ameriprise, nor have they alleged that they refrained from buying stock in another company because of their RPAI investment. In fact, they do not provide any allegations supporting the causation element. *See Jeffers*, R. 21 ¶¶ 97-100. Nowhere in the *Jeffers* complaint do the Plaintiffs make any allegation (1) that their conduct would have been different had Ameriprise's alleged breaches not occurred; (2) that anything related to the RPAI share price or how many shares they own would be different; or (3) that their

---

identifier is either added or removed to mislead the investor as to the true nature of the valuation of the purchase price of their investments." *Jeffers*, R. 21 ¶ 86; *see id.* ¶¶ 87-89.

financial position would be not be same. Without anything remotely related to those allegations, the proximate cause element cannot be satisfied.

Because the *Jeffers* Plaintiffs have not sufficiently alleged that any breaches by Ameriprise were the proximate cause of any damages they might have suffered, Count II of their complaint is dismissed without prejudice.[19] This ruling does not mean Ameriprise owed the Plaintiffs all of the duties alleged. *See Miller v. Harris¸* 985 N.E.2d 671, 679 (Ill. App. Ct. 2d Dist. 2013) (stating that the court does not determine at the motion to dismiss stage whether a fiduciary duty exists, only whether the well-pleaded factual allegations could support that determination). The Court further notes that the breaches sounding in fraud (illustrated above) are required to be pled "with particularity." Those allegations are also insufficiently pled, as further discussed in Section IV.A.

## II. Aiding & Abetting (RPAI): *Schnierson* – Count III; *Olive* – Count III; *Jeffers* – Count IV

The Plaintiffs allege a claim against RPAI for aiding and abetting a breach of fiduciary duty by the Individual Defendants. "[A]iding and abetting is a theory for holding the person who aids and abets liable for the tort itself[.]" *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). The theory is expressly recognized under Maryland law. *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d

---

[19] The damages alleged also might not be sufficient (for any of the claims). The Court may take judicial notice of RPAI's closing stock price on the New York Stock Exchange, which was $15.18 on June 9, 2014, so it is possible that the Plaintiffs may not have even suffered any losses. *See Retail Properties of America, Inc.*, http://www.nasdaq.com/symbol/rpai (last visited June 9, 2014). Ameriprise did not develop this argument, however, so the Court expresses no opinion as to its merits.

1038, 1049 (Md. 1995). RPAI argues that it is a legal impossibility for RPAI to aid and abet a breach of fiduciary duty by directors and officers because a corporation acts *through* its agent and, therefore, cannot "aid" or "abet" itself. *Sadler*, R. 81 at 40. One court has explicitly recognized the validity of that argument, at least when the conduct of the corporate officer was within the scope of his employment. *See Tong v. Dunn*, No. 11 CVS 1522, 2012 WL 944581, at *6 (N.C. Super. 2012). The Plaintiffs cite *Wasserman v. Kay*, 14 A.3d 1193, 1221 n.14 (Md. Ct. Spec. App. 2009), in support of their argument that a corporation can aid and abet a tort committed by its officers when the corporate officer has an independent personal stake in achieving the desired illegal objective. *See Sadler*, R. 84 at 14. But the Court need not address whether there is an exception to the doctrine regarding aiding and abetting by a corporation, or even whether such an exception would apply here. The law is clear: a claim for aiding and abetting a breach of fiduciary fails as a matter of law where there has been no underlying breach of fiduciary duty. *Apple REIT's*, 2013 WL 1386202, at *19 (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)); *Schandler v. N.Y. Life Ins. Co.*, No. 09 Civ. 10463, 2011 WL 1642574, at *13 (S.D.N.Y. Apr. 26, 2011). The Court dismissed the Plaintiffs' claims for breach of fiduciary duty, so it is required to dismiss their aiding and abetting claims as well.

### III.    Unjust Enrichment

####    A.    RPAI & Individual Defendants: *Sadler* – Count II; *Babin* – Count III; *Schnierson* – Count II; *Olive* – Count II; *Jeffers* – Count III

Each complaint contains a count for unjust enrichment against RPAI and/or the Individual Defendants. Unjust enrichment is a form of restitution, meant to "occup[y] the crucial ground between its much-studied neighbors, tort and contract. Restitution deals with nonbargained benefits; tort law with nonbargained harms; contract law with bargained benefits and harms." *Alternatives Unlimited, Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 843 A.2d 252, 274 (Md. Ct. Spec. App. 2004). Its purpose is not to compensate the plaintiff but rather to "forc[e] the defendant to disgorge benefits that it would be unjust for him to keep." *Slick v. Reinecker*, 839 A.2d 784, 797 (Md. Ct. Spec. App. 2003). Under Maryland law, a claim for unjust enrichment consists of three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007) (quoting *Berry & Gold, P.A. v. Berry*, 757 A.2d 113 (Md. 2000)).

The RPAI and the Individual Defendants contend, first, that Maryland law prohibits a claim for unjust enrichment "where the subject matter of the claim is covered by an express contract between the parties." *Sadler*, R. 81 at 41 (citing *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600,

607 (Md. 2000)). Accordingly, they argue that unjust enrichment is unavailable here because the Plaintiffs signed a subscription agreement, and thus, their claim is governed by a contact. The RPAI and the Individual Defendants also argue that the Plaintiffs have not sufficiently alleged the required elements of a claim for restitution.

Unjust enrichment "is an equitable remedy and is ordinarily unavailable where there is a legal remedy such as breach of contract." *Becker*, 2013 WL 6068793, at *5. Parties may plead alternative theories, but they may not include a count for unjust enrichment when there is an express contract governing the relationship of the parties. *Cohen*, 735 F.3d at 615. At least three courts have addressed unjust enrichment claims where the plaintiffs executed subscription agreements to purchase shares, just as the Plaintiffs must have done here, *see, e.g.*, *Jeffers*, R. 21 ¶¶ 77, 112 ("Ameriprise required Plaintiff and the proposed class . . . to sign uniform subscription agreements . . . .")—otherwise they could not allege to be owners of RPAI shares. Each court dismissed the unjust enrichment claims. *See Allyn*, 2013 WL 6439383, at *6-7; *Becker*, 2013 WL 6068793, at *5; *Apple REITS*, 2013 WL 1386202, at *20. Only *Apple REITS* was decided before the Plaintiffs filed their response (or was included in the Defendant's brief). Nonetheless, the Plaintiffs have made no attempt to distinguish this case from the *Apple REITs* decision on this issue. While the case is not dispositive, none of the Plaintiffs in any of the five response briefs even refer to *Apple REITS* when discussing why their unjust enrichment claims should survive the Defendants' motion. Instead, they either

argue that the subscription agreements are not properly before the Court, contend that the subscription agreements are not relevant, or ignore the unjust enrichment claim altogether. *See Sadler*, R. 83 at 15; R 84 at 15; R. 85 at 15; *Babin*, R. 36 at 14-15. With no rationale for why the cases were incorrectly decided, the Court finds the *Allyn*, *Becker*, and *Apple REITS* decisions and their reasoning persuasive, and will follow suit. *See generally Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011) (explaining that parties should not ignore authority that is directly applicable to an issue before a court). The Plaintiffs' unjust enrichment claims against RPAI and the Individual Defendants are therefore dismissed with prejudice.

Even if the Court does not consider the subscription agreements, the unjust enrichment claims would still not survive the Defendants' motions. The Plaintiffs must allege that they conferred a benefit upon the Defendants. *See Dolan v. McQuaide*, 79 A.3d 394, 401 (Md. Ct. Spec. App. 2013). They have not done so. The *Sadler* Plaintiffs find fault with the reverse stock split and the price the Defendants set for the 2012 Offering. Neither of the situations involved the Plaintiffs conferring a specific benefit upon the Defendants. It is also an open question as to whether *anyone* actually benefitted from the transactions. Similarly, the *Schnierson*, *Olive*, and *Jeffers* Plaintiffs denounce the Defendants' conduct regarding the mini-tender offers. But again, no benefit was conferred upon the Defendants in that situation. The same goes for the *Babin* Plaintiffs who believe they paid too much for RPAI shares through the DRP. As previously explained, there is no plausible allegation

that the price was "too much." And the fact the DRP price affected the company, the Individual Defendants, and the shareholders *equally* belies the Plaintiff's argument that RPAI or the Individual Defendants benefitted at their expense—which is what unjust enrichment is designed to remedy. There is no established rule for what satisfies each element of an unjust enrichment claim or when such enrichment claim will succeed. *Hill*, 936 A.2d at 351 (citing Daniel Friedmann, *Restitution of Benefits Obtained Through the Appropriation of Property or the Commission of a Wrong*, 80 COLUM. L. REV. 504, 504-05 (1980)). But any argument here that the Defendants "reap[ed] significant benefits at Plaintiffs' expense," *Sadler*, R. 84 at 15, is not supported by the allegations in the complaints. The Plaintiffs' unjust enrichment claims are dismissed with prejudice on this ground as well.

## B.     Ameriprise: *Jeffers* – Count III

To state an unjust enrichment claim under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). The parties dispute whether unjust enrichment is a stand-alone claim, but that is immaterial at this point. In *Clearly v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011), the Seventh Circuit stated:

> What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. . . . So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim,

then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will *stand or fall* will the related claim. (citing *Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007)) (emphasis added).

Here, the Plaintiffs' claim for unjust enrichment against Ameriprise stands or falls with the claim for breach of fiduciary duty in Count II of the *Jeffers* complaint. The Court has already determined that claim is insufficiently pled; thus, the claim for unjust enrichment must fail as well. Count III of the *Jeffers* complaint is dismissed without prejudice, subject to the Plaintiffs' ability to cure the deficiencies identified in Count II.

## IV.    Constructive Trust (RPAI): *Babin* – Count II

The *Babin* Plaintiffs seek the imposition of a constructive trust against RPAI, alleging that RPAI wrongfully took their funds as a result of selling shares through the DRP at an inflated rate. *Babin*, R. 4 ¶¶ 71-73. This claim fails, however, because a constructive trust is a form of an equitable remedy, not an independent cause of action. *Lyon v. Campbell*, 33 Fed. Appx. 659, 663 (4th Cir. 2002) (applying Maryland law and explaining that "[a] constructive trust is an equitable remedy, not a cause of action in and of itself"). A constructive trust can only be imposed when a defendant has acquired property by "fraud, misrepresentation, or [some] other improper method, or where the circumstances render it inequitable for the party holding the title to retain it." *Wimmer v. Wimmer*, 414 A.2d 1254, 1258 (1980); *accord Porter v. Zuromski*, 6 A.3d 372, 376 (Md. Ct. Spec. App. 2010). As the court in *Washington Suburban Sanitary Commission v. Utilities, Inc. of Maryland*

explained, "The constructive trust, like its counterpart remedies at law, is a remedy for unjust enrichment. The remedy is no longer limited to misconduct cases; it redresses unjust enrichment, not wrongdoing." 775 A.2d 1178, 1188 (Md. 2001) (quoting DAN B. DOBBS, LAW OF REMEDIES § 4.3(2), at 597 (2d ed. 1993)) (internal quotation marks omitted). Here, the Court has already concluded that the *Babin* Plaintiffs' claims for breach of fiduciary duty and unjust enrichment cannot succeed. Without any claims justifying the need for a constructive trust, any count seeking such an equitable remedy automatically fails. Count II of the *Babin* complaint is dismissed with prejudice.

## V.    Violation of Illinois Securities Law of 1953

"The purpose of the [ISL] is to protect innocent persons who might be induced to invest their money in speculative enterprises over which they have little control." *Carpenter v. Exelon Enters. Co., LLC*, 927 N.E.2d 768, 772 (Ill. App. Ct. 1st Dist. 2010). Illinois courts have held that the "law is paternalistic and is to be liberally construed to better protect the public from deceit and fraud in the sale of securities." *Carpenter*, 927 N.E.2d at 772. Nonetheless, claims arising out of the ISL that "contain[] averments of fraud" are subject to Rule 9(b)'s heightened pleading requirements. *Gandhi, LLC*, 689 F. Supp. 2d at 1013.

### A.    Ameriprise: *Jeffers* – Count V

The *Jeffers* Plaintiffs allege that Ameriprise violated the ISL in a number of ways, including "(1) manipulated documents to disguise the true losses in the REIT shares; (2) failed to perform required due diligence into the value and risks of the

REIT shares; and (3) omitted material facts and distributed "[private placement memorandums],[20] offering brochures and other sales materials which contained misrepresentations about the risks and value of the REIT." *Jeffers*, R. 52 at 9; *see* R. 21 ¶¶ 106-25. Ameriprise argues that Count V should be dismissed because the claim is barred by the ISL five-year statute of repose in 815 ILCS 5/13(D)(2); the allegations are insufficient to meet Rule 9(b)'s "particularity" requirement; and the Plaintiffs did not provide adequate notice of the claim, as required by 815 ILCS 5/13(B). *See Jeffers*, R. 47

> Looking to Ameriprise's statute of repose argument, the ISL provides:
>
> No action shall be brought for relief under this Section . . . after 3 years from the date of sale; provided, that if the party bringing the action neither knew nor in the exercise of reasonable diligence should have known of any alleged violation . . . , the 3 year period provided herein shall begin to run upon the earlier of:
>
> (1) the date upon which the party bringing the action has actual knowledge of the alleged violation of this Act; or
>
> (2) the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act.

815 ILCS 5/13(D). Counts have held that Section 5/13(D)(2), while not explicitly clear on its face, means that the three year statute of limitations may be tolled an additional two years from "the date the plaintiff knew or should have known of the violation but in no event [shall a suit be filed] more than five years from the date of

---

[20] A private placement memorandum, also known as a PPM, is a document that contains relevant disclosures about purchasing shares of a company so that the investor can evaluate the risks of a particular investment decision.

the sale." *Wanless v. Burke*, 625 N.E.2d 386, 388 (Ill. App. Ct. 3d Dist. 1993) (citing

815 ILCS 5/13(D)). Thus, a party must file an action for a violation of the ISL within

five years of when the violation occurred or the action is time-barred, regardless of

when the party discovered the violation. S*ee Klein v. George G. Kerasotes Corp.*, 500

F.3d 669, 671 (7th Cir. 2007) ("[T]he total period of repose expires five years after

the violation, no matter when it was discovered." (citing 815 ILCS 5/13(D)(2))); *see*

*also Stone v. Doerge*, No. 02 C 1450, 2004 WL 3019173, at *4 (N.D. Ill. Dec. 28,

2004) ("Plaintiff's [claims] . . . are based upon Defendants' allegedly fraudulent sale

of securities, thus they are governed by the three year statute of limitations period

and a five year statute of repose set forth in the Illinois Securities Act, 815 ILCS

5/13(D)." (citing *Tregenza v. Lehman Bros., Inc.*, 678 N.E.2d 14, 14-15 (Ill. App. Ct.

1st Dist. 1997))).

The *Jeffers* complaint alleges that the Plaintiff class purchased shares

through Ameriprise at $10.00 per share between March 2004 and September 2005.

*Jeffers*, R. 21 ¶ 37. The complaint was not filed until 2012, seven years after the

proposed class purchased their shares. To counter this stark fact, the Plaintiffs

argue that their complaint contains allegations that Ameriprise solicited and sold

shares of the REIT all the way up to 2012, that between 2009 and 2012 Ameriprise

engaged in Account Statement Identifier Deception (ASID), and that members of

the class continued to reinvest their dividends to acquire additional shares of the

REIT. *Jeffers*, R. 52 at 11. But a careful reading of the complaint demonstrates that

the Plaintiff class does not allege that *anyone in the class* purchased stock any time

after 2005—i.e., they do not connect *their own* personal investing activity to anything related to Ameriprise after the sales in 2004 and 2005. *Compare Jeffers*, R. 21 ¶ 37 (Plaintiff initially purchased 8,460 interests of [RPAI] at $10.00 per share."), *with id.* ¶ 82 ("Ameriprise *customers* were induced into purchasing . . . shares of the REIT from 2004 to 2012.") (emphasis added). The Plaintiff class even concedes that "any alleged securities law violations relating to the initial stock purchase may be time-barred." *Sadler*, R. 83 at 3. Count V is therefore dismissed without prejudice.

Alternatively, Count V must be dismissed because it is insufficiently pled. In response to Ameriprise's particularity argument, the Plaintiffs direct the Court to a number of older cases that were all decided before the Seventh Circuit's mandate that allegations of fraud describe the "who, what, where, when and how." *See Jeffers*, R. 60 at 8-9; *cf. AnchorBank*, 649 F.3d at 615. The Plaintiffs do not, however, explain how or where the allegations in their complaint address the pertinent requirements of a fraud-based claim. The complaint alleges that Ameriprise included "false and omitted statements" in the brochures, private placement memorandums, and company-sponsored information it disseminated, *Jeffers*, R. 21 at 115-121, but it does not state precisely what statements were false, or how or why they were false. Similarly, the complaint alleges that Ameriprise was to perform "due diligence" checks of RPAI—i.e., an evaluation of the company's performance and assets—but it does not explain when they were to occur or how comprehensive they were supposed to be, or even why the failure to do so is

fraudulent. Accordingly, these conclusory allegations are insufficient under Rule 9(b).

The *Sadler* plaintiffs can refile Count V if they can establish they purchased shares of RPAI through Ameriprise sometime after July 26, 2007—within the previous five years of them filing their complaint. The Plaintiffs will also need to satisfy the particularity deficiencies discussed here.

### B.    Individual Defendants: *Jeffers* – Count VI

The *Jeffers* Plaintiffs allege that the Individual Defendants violated the ISL through "misrepresentations made in conjunction with the sale of the Inland REIT" and because they "were complicit in the fraud perpetrated by . . . Ameriprise and aided the issuance of fraudulent information both on its own behalf and in assistance to . . . Ameriprise." *Jeffers*, R. 21 ¶¶ 127-28. This count is dismissed because it is time-barred, as discussed above. *See* § V.A. Additionally, these allegations fall well short of what is required under the "with particularity" standard. *See AnchorBank*, 649 F.3d at 615. The Plaintiffs discuss a number of RPAI documents in their complaint. But the Plaintiffs do not put the Individual Defendants on notice of what particular "misrepresentations" they made or "fraudulent information" they disseminated, when it occurred, how it occurred, or where it occurred. The Plaintiffs contend they set forth the "bare bones" of a claim, but without any specific factual allegations detailing the fraud complained of, the Plaintiffs' claim in Count VI cannot stand. It is also dismissed without prejudice but

may be refiled in the event the Plaintiffs are able to provide specific facts supporting their claim.

## VI. Violation of FINRA Regulations (Ameriprise): *Jeffers* – Count VII

The Plaintiffs allege that Ameriprise wilfully violated certain FINRA regulations[21] by "misleading investors, falsely representing the product to its registered representatives who in turn falsely represented the product to investors, especially with respect to the risks associated with the highly speculative real estate private placement." *Jeffers*, R. 21 ¶¶ 135-36. They claim that Ameriprise ignored certain FINRA "regulations and rules," including NASD Notice 03-71, FINRA Notice 09-09, and FINRA Notice 10-22. *Id.* ¶¶ 133-34. Ameriprise contends that this claim should be dismissed because there is no private right of action for a violation of FINRA rules or regulations. *Jeffers*, R. 47-1 at 14. In support, it directs the Court to *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 275 n.5 (S.D.N.Y. 2012); *Brady v. Calyon Sec.*, 406 F. Supp. 2d 307, 312 (S.D.N.Y. 2005); *Witt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 602 F. Supp. 867, 869 (W.D. Pa. 1985); and *Emmons v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 532 F. Supp. 480, 483 (S.D. Ohio 1982). Each of these cases rejected a private cause of action based on an alleged violation of this type of rule—i.e., one involving the sale of securities.

---

[21] FINRA was formerly known as the National Association of Securities Dealers, Inc. ("NASD").

The Plaintiffs contend these cases are in contrast to *Buttrey v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 144 (7th Cir. 1969), which held that "parties may be liable for violations of the [Securities] Act and [SEC] Rule 10b-5 as long as they engage in fraudulent activity 'in connection with' the sale or purchase of securities or in a fraudulent 'course of business.'" *Buttrey* has never been explicitly overruled, so there *could* be a private claim for relief in some circumstances. *See Wehrs v. Benson York Grp.*, No. 07 C 3312, 2008 WL 753916, at *4 n.5 (N.D. Ill. Mar. 18, 2008) ("The Seventh Circuit has found that although not every violation of Exchange rules is per se actionable, a violation of Rule 405 can, in some cases, create a private claim for relief. More recently, however, other courts have found no private right of action under Rule 405.") (internal citations omitted). However, numerous courts have questioned the validity of *Buttrey*, and the more recent trend is against allowing a private right of action. *See, e.g.*, *Spicer v. Chi. Bd. or Options Exch., Inc.*, 977 F.2d 255, 264 (7th Cir. 1992) ("Only one discernible line of cases, starting with *Buttrey*, could *possibly* constitute a 'routine and consistent' recognition of an implied remedy . . . ." (emphasis in original); *Pyle v. White*, 796 F. Supp. 380, 385 (N.D. Ind. 1992) ("The weight of more recent authority is against implying a cause of action under NASD suitability and NYSE know-your-customer rules."). In addition, *Buttrey* did not address the specific FINRA regulations the Plaintiffs allege that Ameriprise violated here, so its overall application is limited.

The burden is on the Plaintiffs to establish that there is an implied private right of action in the regulations, s*ee Buttrey*, 410 F.2d at 142; *Sanders v. John*

*Nuveen & Co.*, 554 F.2d 790, 797 (7th Cir. 1977); yet, the most recent case the Plaintiffs cite in support of their argument is *Cook v. Goldman, Sachs & Co.*, 726 F. Supp. 151, 156 (S.D. Tex. 1989)—a twenty-five year old case from a different district interpreting NASD Rule 405(q). In light of this information, the Court is not persuaded that a private right of action flows from a violation of the FINRA regulations and rules at issue here. Count VII of the *Jeffers* complaint is dismissed with prejudice.

## CONCLUSION

For the reasons discussed, the Individual Defendants' and RPAI's motions to dismiss are granted. *See Sadler*, R. 80; *Babin*, R. 33; *Schnierson*, R. 35; *Olive*, R. 27; *Jeffers*, R. 48. Ameriprise's motion to dismiss is also granted. *Jeffers*, R. 47. The *Sadler*, *Babin*, *Schnierson*, and *Olive* cases are dismissed with prejudice. Counts I, II, IV, and VII of the *Jeffers* complaint are dismissed with prejudice. Counts III, V, and VI of *Jeffers* are dismissed without prejudice. The *Jeffers* Plaintiffs may file an amended complaint as to Counts III, V, and VI by July 10, 2014, should they be able to cure the deficiencies identified above. All motions for class certification are denied as moot.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: June 10, 2014